UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION


ROGER A. CHATMAN,                    )
                                     )
                Plaintiff,           )
                                     )
        v.                           )        No.  2:05CV11 TIA
                                     )
JO ANNE B. BARNHART, Commissioner    )
of Social Security,                  )
                                     )
                Defendant.           )


**MEMORANDUM AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.  The

parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

**I.      Procedural History**

On October 15, 2002, Claimant Roger A. Chatman filed an application for Disability

Insurance Benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. (Tr.

76-78).[1]  In his application for benefits and Disability Report Adult, Claimant asserts that his

disability began on April 12, 2002, due to severe arthritis, carpal tunnel syndrome, shoulder

injury, problems remembering, and a poor ability to read and write.  (Tr. 76-78, 90-91).  On initial

consideration, the Social Security Administration denied Claimant's claims for benefits.  (Tr. 62-

65).  Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 58).

On March 11, 2004, a hearing was held before an Administrative Law Judge ("ALJ").

---

[1]"Tr." refers to the page of the administrative record filed by the defendant with its Answer.
(Docket No. 10/filed May 19, 2005).

(Tr. 26-60). Claimant testified and was represented by counsel. (Id.) A vocational expert also testified at the hearing. (Tr. 52-56). Thereafter, on June 25, 2004, the ALJ issued a decision denying Claimant's claims for benefits. (Tr. 11-17). The Appeals Council found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision on January 15, 2005. (Tr. 3-5). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. Hearing on March 11, 2004

#### 1. Claimant's Testimony

At the hearing on March 11, 2004, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 28-52). At the time of the hearing, Claimant was fifty-eight years of age. (Tr. 30). Claimant testified that his date of birth is May 6, 1945, and sixth grade is the highest grade of education he completed at age sixteen. (Tr. 30-32). Claimant is right handed. (Tr. 39). Claimant testified that he cannot read or write, and he was held back in school four or five times. (Tr. 32-33). Claimant's wife completed his application for benefits, maintains the family checkbook, and pays the bills. (Tr. 33). Claimant testified that he last worked on April 12, 2002. (Tr. 30-31).

Claimant worked at A. P. Green Brick Plant for thirty-three years running brick press equipment. (Tr. 33-34). Claimant's job duties included starting the brick press and removing the bricks from the machine and placing the bricks on either a car or a pallet. (Tr. 34). Claimant explained that the press put out four brick at a time, and he would grab two bricks with each hand. (Tr. 34). Each fire brick weighed twelve to thirteen pounds. (Tr. 35). The ALJ noted that

in one file the title of Claimant's job was brick setter but in another, the title was brick skidder. (Tr. 35). Claimant explained that he last worked as a brick setter, and this job required him to remove the brick off the press. (Tr. 35-36). Claimant explained a brick skidder removes the brick from the car and places the brick on the pallet. (Tr. 36). Both jobs required lifting bricks and placing the bricks elsewhere. With respect to operating equipment, Claimant turned on the machine and sometimes turned a wheel to check the brick. (Tr. 36). Claimant explained how he had four weeks of training to learn how to operate the machine. (Tr. 37). Claimant acknowledged the training did not require him to read manuals but included on hands training by another employee. (Tr. 37). Claimant's job was a piece work job so that his compensation was tied to the amount of brick he stacked. (Tr. 38). In other words, the more brick he could stack, the more money he received. Claimant worked as the skidder for four years and worked on the press for twenty years. (Tr. 38). When Claimant first started working, he cleaned up messes by shoveling the messes. (Tr. 39).

Claimant testified that he has injured his right arm, and Dr. Wagner performed surgery on his right shoulder. (Tr. 39). Claimant testified that he experiences pain off and all the time. (Tr. 39). The pain sometimes limits his ability to move his shoulder, and he cannot lift his arm over his head. (Tr. 40). Claimant testified that he cannot paint because of his inability to reach. (Tr. 40). Claimant experiences numbness in his hands and has reduced grip strength to the point where he can hardly open a jar of jelly. (Tr. 43). Claimant testified that he could not use a tool such as a screwdriver for a long period of time. (Tr. 44).

Claimant suffers from hearing loss and experiences ringing in his ears. (Tr. 44). The hearing loss affects his ability to hear a telephone or a conversation. (Tr. 45). Claimant has to

ask a speaker to repeat a statement/ (Tr. 45). Dr. Martin treats Claimant's arthritis with Celebrex. (Tr. 45). To alleviate his pain, Claimant takes Advil. (Tr. 46). Claimant testified that he has arthritis all over his joints, arms, and especially in his lower back. Claimant has problems straightening his back, bending down, or stooping down. (Tr. 46). Claimant testified that he can carry a small grocery bag. (Tr. 47). Claimant's wife massages his back, and he soaks in a tub with hot water sometimes. (Tr. 47). Claimant's arthritis in his legs causes him to walk slow. Dr. Martin last treated Claimant in September, 2003, and thereafter, Claimant changed doctors, because Dr. Martin moved. (Tr. 48).

Claimant has had bilateral carpal tunnel surgery by Dr. Weaver on both hands before he stopped working, but he returned to work after the surgery. (Tr. 41-42). Claimant testified that he did not stop working as a result of the carpal tunnel surgery, and Dr. Weaver continued to treat him until March, 2002. (Tr. 42). Claimant stopped working on April 12, 2002, because the plant closed down and went out of business. Claimant indicated that if the plant had not closed down, he would have continued to work. Claimant testified that he did not think he could work at the present time. (Tr. 42).

Claimant testified the he has difficulty with mathematics and would not be able to calculate how much money he should receive after making a purchase. (Tr. 49-50). The test results at the University of Missouri Columbia showed Claimant to have problems with short term memory, and he should take another person with him for a doctor's visit. (Tr. 50). Claimant testified that his wife normally accompanies him during doctor's visits. (Tr. 50).

As to his daily activities, Claimant testified that he can operate a motor vehicle, run an errand such as purchasing a loaf of bread, and mow the lawn using a riding lawnmower. (Tr. 51).

### 2. Testimony of Vocational Expert

Vocational Expert Jeffrey F. Magrowski, Ph.D., reviewed Claimant's file before the hearing and listened to Claimant's testimony during the hearing. (Tr. 52-53). Dr. Magrowski classified claimant's past relevant work as a brick setter and a brick skidder ranging from heavy to very heavy with respect to exertional requirements and unskilled. (Tr. 53). In terms of the <u>Dictionary of Occupational Titles</u>, the closest job Dr. Magrowski could find was a brick unload tender but that he could not locate a brick setter or a brick skidder in the DOT. (Tr. 53). Dr. Magrowski noted that the file indicated that Claimant lifted up to one hundred pounds but during the hearing Claimant described lifting twenty-five pounds. (Tr. 53). Claimant explained the discrepancy in weight he lifted because sometimes the bricks produced weighed more or varied in size. (Tr. 54-55). Dr. Magrowski explained that although the DOT indicates the position is semi-skilled, based on Claimant's testimony, the job appeared to be pretty simple and routine. (Tr. 55). Claimant's counsel indicated that he did not have any questions for the vocational expert at that time. (Tr. 55). The ALJ explained that he did not ask any further questions inasmuch if he finds that Claimant cannot do his prior work, he would utilize the grids and there would be no need for the vocational expert to answer hypothetical questions. (Tr. 56).

### 3. Open Record

During the hearing, the ALJ determined that the record needed to be further developed and stated that the record would be held open for thirty days so that Claimant could submit the most recent medical records from Dr. Wagner and the medical records from his new doctor. (Tr. 56-57). The ALJ indicated that he was amenable to granting additional time to obtain the medical evidence so long as counsel made a request. (Tr. 57). Claimant's counsel asked to

submit additional evidence including annual hearing tests and the exit physical performed by the plant doctor.  (Tr. 57-58).  A review of the record shows that counsel did not submit additional evidence to the ALJ before he issued a decision denying Claimant's claims for benefits.  (Tr. 110-207).

### 4.  Forms Completed by Claimant

In the Claimant Questionnaire completed October 21, 2002, Claimant reported experiencing problems with his hand and shoulders when he tries to use them for long periods of time.  (Tr. 100).  Claimant reported difficulty following directions.  (Tr. 101).  Claimant is able to do household repairs so long as his wife reads the directions to him.  (Tr. 101).  Claimant has a drivers license and does drive.  (Tr. 102).  Claimant responded in the negative to the question asking if he has received any medical treatment since he filed his claim or has an upcoming appointment scheduled.  (Tr. 103).

In the Disability Report Adult, Claimant reported that he stopped working as a brick setter on April 12, 2002, because "the plant where I worked closed down."  (Tr. 91-92).  Claimant described his job duties as including lifting six to eight thousand bricks off a press and carrying the bricks to a car and loading the bricks.  (Tr. 92).  Claimant indicated that he lifted different weights on different days.  (Tr. 92).

## III.    Medical Records

The hearing test on September 9, 1999, showed Claimant to have a moderate loss for speech sounds in his left ear and a mild loss in his right ear.  (Tr. 150).  Claimant was further advised that he has a possible hearing loss present in both of his ears for sounds associated with speech and conversation and warned that excessive noise could destroy his ability to hear

permanently.  Claimant was advised to wear appropriate hearing protection available to him at work.  (Tr. 150).  On December 3, 1999, Dr. Daniel Schumaier, an audiologist at Industrial Hearing Conservation Services, Inc., advised Claimant to have an annual hearing recheck and to wear hearing protection at work when exposed to loud noise.  (Tr. 151).  On March 8, 2000, Dena Saak, a R.N., noted the results of Claimant's hearing tests revealing Claimant has a significant Standard Threshold Shift.  (Tr. 149).

On January 23, 2001, Dr. Kevin Martin treated Claimant for an upper respiratory infection.  (Tr. 167).

On February 16, 2001, Dr. Thomas Ahmann performed a left epididymectomy, right spermatocelectomy, and right vasectomy on Claimant.  (Tr. 135).  Dr. Ahmann noted that Claimant tolerated the procedure well.  (Tr. 135).

A MRI of Claimant's right shoulder on March 6, 2001, revealed degenerative changes of a mild degree but no fracture or dislocation.  (Tr. 133).

On September 18, 2001, Claimant returned to Dr. Martin for a blood pressure check up. (Tr. 165).  Dr. Martin diagnosed Claimant with esophageal reflux and benign hyperplasia of the prostate and prescribed Ciphex and Hytrin.  (Tr. 164).  On October 31, 2001, Claimant returned for a prescription refill.  (Tr. 163).

On October 29, 2001, Claimant reported a one-year history of bilateral hand numbness and tingling.  (Tr. 144).  In the impression section, Dr. Kathleen Weaver noted anterior shoulder instability and possible crossover of the ulnar and median nerves.  Dr. Weaver indicated that she would like to review more thorough nerve conduction studies including muscle potentials.  Dr. Weaver started Claimant on a shoulder physical therapy program for his shoulder instability.  (Tr.

144).  On November 30, 2001, Claimant returned for treatment after he had repeat nerve conduction studies which revealed carpal tunnel disease bilaterally with his right hand worse than his left hand.  (Tr. 143).  Claimant reported significant pain.  Dr. Weaver recommended a neurologic evaluation by Dr. Khwaja, continued physical therapy, and arthroscopic carpal tunnel surgery.  (Tr. 143).

A preoperative MRI of Claimant's chest performed on December 3, 2001, revealed hyperinflation, mild cardiomegaly without congestive heart failure, and chronic changes of the chest.  (Tr. 128-29, 148).

On December 13, 2001, Dr. Weaver performed an arthroscopic carpal tunnel release bilaterally to alleviate Claimant's bilateral carpal tunnel disease.  (Tr. 122, 147).  Claimant's chief complaint was bilateral numbness and tingling of the hands.  (Tr. 120, 145).  In the recovery room, Claimant reported his hands felt immediately better.  (Tr. 122, 147).  Dr. Weaver discharged Claimant to home.  (Tr. 122, 147).  In a follow-up visit on December 24, 2001, Dr. Weaver removed Claimant's sutures.  (Tr. 119).  Claimant reported feeling well with no areas of pain.  Dr. Weaver released Claimant to work duties as tolerated and to complete physical therapy on his neck and shoulders.  (Tr. 119).   In a status-post visit, Claimant reported almost no tingling at all and being extremely pleased with the outcome of the surgery.  (Tr. 142).  Dr. Weaver recommended that Claimant start physical therapy.  (Tr. 142).

On December 20, 2001, Claimant reported joint pain and steadily gaining weight.  (Tr. 162).  Dr. Martin prescribed Celebrex.  (Tr. 162).

In a follow-up visit on January 14, 2002, Claimant reported no complaints and has been back to full work duties.   (Tr. 141).  Examination revealed full range of motion of Claimant's

shoulders.  Dr. Weaver encouraged Claimant to do a home physical therapy program to avoid

further shoulder problems.  (Tr. 141).  On March 18, 2002, Claimant reported his numbness and

tingling completely gone but intermittent right shoulder pain.  (Tr. 140).  Examination revealed a

full range of motion of Claimant's shoulders.  Dr. Weaver noted in the impression section that

Claimant has known mild degenerative changes in wrist and shoulder and status-post carpal tunnel

release.  Dr. Weaver explained to Claimant how he has to continue his home exercise program on

his shoulders and prescribed Celebrex for Claimant's degenerative changes.  Dr. Weaver advised

Claimant not to use his hand as a hammer, and indicated that he would treat Claimant on an as

needed basis.  Dr. Weaver opined that Claimant can return to full work duties without limitations.

Claimant called on March 20, 2002, to report doing well on the Celebrex.   (Tr. 140).

On April 8, 2002, Claimant returned to Dr. Martin for treatment and reported how he

would soon lose his insurance.  (Tr. 160).  In a follow-up visit on July 9, 2002, Dr. Martin

scheduled Claimant for a neuropsychological evaluation on August 21, 2002, for adult learning

disability at Rusk Rehab Center in Columbia, Missouri.  (Tr. 159-60).  On July 19, 2002, Claimant

returned for medication refills of Aciphex and Diovan.  (Tr. 157).

On August 12, 2002, Dr. Martin treated Claimant's hypertension by increasing his Diovan

prescription to bring down his systolic and diastolic numbers.  (Tr. 156).

On referral by Dr. Kevin Martin, Dr. Stephanie Reid-Arndt, Ph.D., completed a

neuropsychological evaluation of Claimant on August 21, 2002.  (Tr. 110-116).  Dr. Reid-Arndt

noted that Claimant has a reported long-standing history of learning difficulties as well as recent

decline in memory functioning.  (Tr. 110).  On referral for neuropsychological testing, Dr. Reid-

Arndt is to provide information regarding Claimant's current cognitive strengths and weaknesses.

Claimant reported a long-standing history of difficulties learning new information and a recent increase in memory difficulties. Claimant reported feeling somewhat depressed since the loss of his job in 2001. (Tr. 110). Claimant denied any history of receiving any psychological services. (Tr. 111). Claimant reported working in a brick factory for thirty three years until the factory closed in September 2001, and not having worked since that time due to his limited cognitive abilities and physical limitations. (Tr. 111). Dr. Reid-Arndt found Claimant to have borderline intellectual functioning with current relative weaknesses in academic abilities, language skills, attention, and verbal memory, and his visual memory and manual motor functioning were generally intact. (Tr. 112). Dr. Reid-Arndt opined that Claimant's current functioning reflects a long-standing history of learning disabilities in reading and writing, as well as attention and memory difficulties of an unclear etiology. Based on his currently limited cognitive skills, Dr. Reid-Arndt opined that Claimant would have significant difficulties finding and maintaining full-time competitive employment noting that his problems with attention and memory would make job retraining challenging. Dr. Reid-Arndt determined Claimant's IQ to be 71. (Tr. 112).

An intravenous pyelogram performed on August 28, 2002, revealed indistinct lateral border of Claimant's left kidney consistent with the presence of cyst previously identified on a CT scan. (Tr. 117).

On August 29, 2002, Dr. Reid-Arndt set forth in a letter to Claimant a brief summary of results and recommendations based on the neuropsychological evaluation. (Tr. 138-40). Dr. Reid-Arndt noted that Claimant is currently demonstrating significant cognitive limitations, likely reflecting his long-standing history of limited intellectual functioning and learning disabilities. (Tr. 138). The results from the evaluation also suggested that Claimant will most likely experience

- 10 -

significant difficulties learning new information. (Tr. 138). Dr. Reid-Arndt opined that inasmuch as Claimant's limitations are likely to have long-standing implications on his ability to maintain full time competitive employment, Claimant should consider applying for Social Security Disability. (Tr. 138).

In a letter dated October 21, 2002, Dr. George Comfort, the plant physician at A.P. Green Refractories, provided a treatment history of Claimant during his employment. (Tr. 169). Dr. Comfort explained how Claimant injured his right shoulder throwing brick in November, 2000. The March 5 x-ray revealed some mild degenerative changes. Dr. Comfort noted that on August 31, 2001, Claimant reported numbness and tingling in his right hand. Dr. Comfort opined that he thought Claimant has carpal tunnel syndrome and treated him with a wrist splint and anti-inflammatory medication. Examination of September 17 showed Claimant to have positive Tinel sign and mildly positive Phalen's test. Dr. Comfort referred Claimant to Dr. Weaver ,an orthopedist, for treatment, and on December 13, 2001, Dr. Weaver performed bilateral carpal tunnel surgery. Examination by Dr. Comfort on February 26, 2002, showed a good range of motion of his right shoulder, and Dr. Weaver released Claimant to return to work with no restrictions. On March 20, 2002, Claimant reported continued right shoulder pain. Examination revealed full range of motion except for lack of full internal rotation with Claimant's arm abducted. At that time, Dr. Comfort attempted to refer Claimant to Dr. Weaver for treatment but the company was closing down and undergoing bankruptcy. (Tr. 169).

On May 14, 2002, Dr. John Wagner treated Claimant for his right shoulder pain during an initial visit for Workers Compensation. (Tr. 174). Claimant reported injuring his shoulder one year earlier while throwing a brick into a tub. The company doctor treated him with medication,

and he experiences "lock up" of the shoulder. Claimant reported taking Celebrex, Terazosin, and Aciphex. Examination revealed an excellent range of motion with 170 degrees of abduction and forward flexion and 80 degrees of external rotation. Dr. Wagner reported popping in both of Claimant's shoulders. The x-rays of the shoulders showed degenerative joint disease of the AC joint and Type III acromion. Dr. Wagner ordered a MRI to determine if there is anything in the shoulder that would be causing the "locking up." In a follow-up visit on May 21, 2002, Dr. Wagner opined that Claimant has evidence of tendinitis in his shoulders. (Tr. 174). The MRI revealed a 3 x 5 mm loose body and moderate to severe rotator cuff teninopathy. (Tr. 173, 177). Dr. Wagner opined that the loose body explains Claimant's locking up and tendinitis in his shoulders. Dr. Wagner indicated that he would recommend Claimant have his shoulder arthroscoped with subacromial decompression, resection of the distal clavicle, removal of the loose body, and possibly a mini open repair of the rotator cuff. (Tr. 173).

On June 19, 2002, Dr. Wagner performed the arthroscopic surgery and noted that Claimant had some chondromalacia of the glenohumeral joint with a loose body, some partial thickness rotator cuff tear, and some fraying of the labrum of the right shoulder. (Tr. 173, 175-76). Dr. Wagner debrided the labrum and the rotator cuff with a shaver and removed the loose body. On June 26, 2002, Claimant returned and reported doing very well after his shoulder scope and acromioplasty, debridement of the labrum, and partial thickness tear of the rotator cuff, removal of the loose body, and excision of the distal clavicle with acromioplasty. Claimant appeared to be comfortable, and examination revealed good active range of motion of the shoulder. (Tr. 173). Dr. Wagner opined that Claimant is unable to work at that time and started him on a rehab program. (Tr. 171-72). On July 24, 2002, Dr. Wagner noted that Claimant has a

good early range of motion of his shoulder and a good early response to physical therapy. Dr. Wagner opined that if Claimant continued to progress at this rate, he could return to some limited duty at that time. In the follow-up visit on August 22, 2002, Dr. Wagner noted how the physical therapy is helping, and Claimant is doing well. Dr. Wagner released Claimant to go back to work on August 26, 2002, on limited duty with no overhead work and lifting 50, occasionally 75 pounds. Dr. Wagner opined that Claimant could return to regular work duty with no restrictions on September 23, 2002. (Tr. 171-72). On November 14, 2002, Dr. Wagner formulated a disability rating on behalf of Claimant. Claimant returned to his office and reported mild pain and stiffness but taking Advil alleviates the pain quite a bit. (Tr. 171). Examination revealed smooth range of motion of Claimant's right shoulder and equal to the left except for a slight decrease in abduction and external rotation of about 15 degrees of each motion. (Tr. 170). Dr. Wagner noted that internal rotation and forward flexion to be excellent with no evidence of clicking, snapping, or popping in the right shoulder. Dr. Wagner opined that Claimant has reached maximum medical improvement, has done extremely well with his physical therapy, and able to resume full duty work. Dr. Wagner discharged Claimant from care and determined Claimant to have a residual disability equivalent to 7.5 percent of the right upper extremity measured at the level of the shoulder secondary to his injury and subsequent surgery. (Tr. 170). On December 13, 2002, Dr. Michael Quinlan of Mexico Medical Specialists, performed a disability evaluation. (Tr. 178). Dr. Quinlan noted that Claimant alleges arthritis, illiteracy, and memory problems. Claimant reported working at A.P. Greens for thirty-three years as a brick skidder until the plant closed last summer. Claimant reported he has been unable to find work because of his inability to read and write. (Tr. 178). Claimant reported memory problems all of his life. (Tr.

179).  Dr. Quinlan noted that Claimant is able to follow direction pretty well.  Claimant listed his medication regime as including Aciphex, Ibuprofen, Celebrex, Diovan, Zyrtec, and Terasosin.  (Tr. 179).  Examination revealed range of motion to be limited in upper extremities.  (Tr. 180).  Dr. Quinlan included in his diagnosis DJD, status post right shoulder surgery for impingement syndrome, status post carpal tunnel surgery of the right wrist, controlled hypertension, and controlled gastroesophageal reflux disease.  Dr. Quinlan opined that Claimant is limited in his upper extremities but that Claimant's illiteracy is his biggest barrier to obtaining employment inasmuch as most companies require a high school education.[2]  (Tr. 180).

On January 9, 2003, Dr. Mark Altomari, a PhD clinical psychologist, completed a Mental Residual Functional Capacity Assessment and found Claimant to be markedly limited in his ability to understand and remember detailed instructions.  (Tr. 182-85).  Dr. Altomari noted that Claimant has the ability to understand, remember, and carry out short and simple instructions, but Claimant would have difficulty learning new routines.  (Tr. 184).  Dr. Altomari opined that Claimant's work history demonstrates that Claimant can reliably carry out routines once he has learned the routine.  Dr. Altomari further opined that Claimant can adapt to most routine work changes and make simple work-related decisions.  Dr. Altomari noted that Claimant's condition is chronic and static and he has endured his condition his entire life.  (Tr. 184).

In the Psychiatric Review Technique completed by Dr. Altomari on behalf of Disability Determinations, on January 9, 2003, Dr. Altomari noted that Claimant has organic mental

_____

[2]A treating physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight."  Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005), citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

disorders, Listing 12.02, as evidenced by a memory impairment and perceptual or thinking disturbances. (Tr. 186-99). Dr. Altomari determined that Claimant has mild limitations of activities of daily living and maintaining social functioning, and moderate limitations in maintaining concentration, persistence, and pace. (Tr. 196). Dr. Altomari noted that on Claimant's application, he alleged an inability to read, write, or remember. (Tr. 198). Dr. Altomari found Claimant's allegations to be fully credible. Dr. Altomari noted that Claimant difficulties have been life long, and he worked in spite of a severe impairment. Dr. Altomari opined that Claimant could probably perform simple, repetitive tasks, but he would have difficulty acquiring new routines. Dr. Altomari further opined that Claimants's condition is chronic and should last for at least twelve months. (Tr. 198).

In the Physical Residual Functional Capacity Assessment completed on January 14, 2003, Dr. Andrew Matera, listed right shoulder arthropathy as Claimant's primary diagnosis and cognitive deficits as his secondary diagnosis. (Tr. 200). Dr. Matera indicated that Claimant's exertional limitations included that Claimant could occasionally lift fifty pounds; could frequently lift twenty-five pounds; could stand or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and was limited in pushing and/or pulling. (Tr. 201). Dr. Matera noted Claimant has right shoulder pain and has had surgery for impingement syndrome, chondromalacia, and loose body. Dr. Matera noted how MRI findings revealed moderate to severe AC DJD and moderate to severe rotator cuff tendinopathy would reasonably produce his symptoms of pain. (Tr. 201). Dr. Matera indicated that Claimant's postural limitations included that Claimant could occasionally crawl and frequently climb ramps/stairs, balance, stoop, kneel, and crouch. (Tr. 202). Dr. Matera further indicated that Claimant has no established

manipulative limitations or visual limitations. (Tr. 203). With respect to communicative limitations, Dr. Bowman found none to be established with respect to speaking but limited as to hearing. (Tr. 204). Dr. Matera opined that Claimant's claim of decreased hearing to be consistent with the medical evidence and credible, but Claimant hears well enough for communication exchange. With respect to environmental limitations, Dr. Matera determined that Claimant's hearing deficit would require him to avoid exposure to noise. (Tr. 204). Based on his thorough review of the medical records, Dr. Matera opined that Claimant's symptoms of shoulder pain are consistent with his radiologic and operative findings and are credible. (Tr. 205). Dr. Matera noted that Claimant's surgeries were successful in improving his range of motion and pain. Likewise, physical therapy and medications alleviated Claimant's pain. Dr. Matera noted how Claimant's orthopedic surgeon discharged him to full activities on August 22, 2002, with the only limitation imposed on overhead reaching. Dr. Matera noted that although Dr. Wagner found Claimant's functional capacity to be regular duty with no restrictions on September 23, 2002, the severities revealed on the MRI cause him to doubt if Claimant would be able to return to work with no restrictions. Dr. Matera further opined that the consultative evaluator's statement of December 13, 2002, regarding Claimant's inability to find a job in the work force suitable to him, is a finding reserved for the commissioner. (Tr. 205).

## IV.    The ALJ's Decision

The ALJ found that Claimant met the disability insured status requirements through the date of the decision, June 25, 2004. (Tr. 16). The ALJ found that Claimant has not engaged in substantial gainful activity since April 12, 2002, the alleged onset date of disability. The ALJ found that the medical evidence establishes that Claimant's arthritis, status-post June 19, 2002,

shoulder surgery, is a medically determinable severe impairment, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found that Claimant's allegations of limitations precluding all work activity are not totally credible and not consistent with the evidence as a whole. The ALJ further found that Claimant has the residual functional capacity to perform an essentially full range of medium work activity, including the ability to lift and carry up to fifty pounds occasionally and twenty-five pounds frequently, to stand, walk, and sit up to six hours each in an eight-hour workday with normal breaks. The ALJ further found that Claimant has the physical exertion and non-exertional requirements of work except climbing ladders, ropes, or scaffolds, occasionally crawling, and performing very complex or detailed work. (Tr. 16). The ALJ opined that Claimant is unable to perform any of his past relevant work as a brick-skidder and brick-setter. (Tr. 17). The ALJ noted that Claimant is an individual of advanced age and has a marginal-to-limited education. The ALJ determined that Claimant has no transferable skills from any past relevant work, and transferability of skills is not an issue in this case. The ALJ opined that Claimant has the residual functional capacity to perform the full range of medium work. (Tr. 17).

Considering Claimant's exertional capacity for medium work, age, education, and work experience, the ALJ opined that Claimant is not disabled . (Tr. 17). The ALJ thus concluded that Claimant was not under a disability at any time through the date of his decision. (Tr. 17).

## V.       Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the

Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404.1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is

not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ

proceeds to step five in which the ALJ determines whether the claimant is capable of performing

other work in the national economy. In step five, the ALJ must consider the claimant's "age,

education, and past work experience." Only if a claimant is found incapable of performing other

work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also

Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be

affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274

F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a decision." Id. The court's review

"is more than an examination of the record for the existence of substantial evidence in support of

the Commissioner's decision, we also take into account whatever in the record fairly detracts

from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will

affirm the Commissioner's decision as long as there is substantial evidence in the record to

support his findings, regardless of whether substantial evidence exists to support a different

conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative

record and consider:

1.	The credibility findings made by the ALJ.

2.	The claimant's vocational factors.

3.	The medical evidence from treating and consulting physicians.

4.	The claimant's subjective complaints relating to

exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the
    claimant's impairments.

6.  The testimony of vocational experts when required which
    is based upon a proper hypothetical question which sets forth the claimant's
    impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the

record as a whole because the ALJ failed to categorize Claimant's intellectual functioning as a

nonexertional impairment. To the extent Claimant argues that the ALJ erred in finding that his

impairments do not meet Listing 12.05(C), the undersigned finds this argument to be without

merit. In relevant part, Listing 12.05:

> Mental retardation: Mental retardation refers to significantly subaverage general
> intellectual functioning with deficits in adaptive functioning initially manifested
> during the developmental period; i.e., the evidence demonstrates or supports onset
> of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A,
> B, C, or D are satisfied.
> C. A valid verbal performance, or full scale IQ of 60 through 70 and a physical or
> other mental impairment imposing an additional and significant work-related
> limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. Inasmuch as Claimant's has an IQ of 71, he is

unable to satisfy the requirements of the listing. "[A] person's IQ is presumed to remain stable

over time in the absence of any evidence of a change in a claimant's intellectual functioning."

Muncy v Apfel, 247 F.3d 728, 734 (8th Cir. 2001); see also 65 Fed. Reg. 50,753 (2000)

(explaining that the regulations "permit us to use judgment, based on current evidence, to infer

when the impairment began.").  Thus, this assertion is without merit.

Generally, when a claimant has a nonexertional impairment, such as pain or borderline intellectual functioning, the ALJ must obtain testimony from a vocational expert in order to satisfy the Commissioner's burden at step five of the sequential evaluation process.  Hall v. Chater, 62 F.3d 220, 224 (8th Cir. 1995).  Even though Claimant's borderline intellectual functioning was not of listing-level severity, the ALJ failed to question the vocational expert regarding how Claimant's level of intellectual functioning impacted the formation of his RFC.  Although the ALJ called a vocational expert to testify at the hearing, the ALJ determined he would utilize the grids once the expert determined that Claimant could not perform his past relevant work.  The ALJ determined that the vocational expert did not need to answer hypothetical questions. The Eighth Circuit has "concluded that borderline intellectual functioning ... is a significant nonexertional impairment that must be considered by a vocational expert."  Lucy v. Chater, 113 F.3d 905,  909 (8th Cir. 1997).  Thus, the ALJ erred by using the Medical-Vocational Guidelines to determine whether Claimant was disabled.  Accordingly, this case is remanded for reconsideration and for more specific questioning of the vocational expert by the ALJ.  Inasmuch as the undersigned is remanding the case, the ALJ should also explicitly consider the consultative psychological evaluation report prepared by Dr. Stephanie Reid-Arndt.

Two sentences in 42 U.S.C. § 405(g) govern remands.  Shalala v. Schaefer, 509 U.S. 292, 296 (1993); Melkonyan v. Sullivan, 501 U.S. 89, 96 (1991).  Under sentence four, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with our without remanding the cause for a rehearing."  Sentence four requires substantive ruling on the

correctness of the administrative decision. <u>Melkonyan</u>, 501 U.S. at 98; <u>Buckner v. Apfel</u>, 213

F.3d 1006, 1010 (8th Cir. 2000). Further, case law suggests that a district court should conduct a

plenary review of the entire record before entering a judgment affirming, modifying, or reversing

the Commissioner's decision with or without a remand order. <u>See</u> <u>Schaefer</u>, 509 U.S. at 297;

<u>Buckner</u>, 213 F.3d at 1010. As previously stated, after review of the record in this case, the

undersigned finds that the cause should be remanded to the Commissioner to allow the ALJ

explicitly evaluate the findings of Dr. Reid-Arndt and elicit testimony from a vocational expert

regarding the impact of Claimant's borderline intellectual functioning on his RFC. Therefore, for

all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social

security benefits be **REVERSED** and this case be **REMANDED** to the Commissioner for further

proceedings consistent with this Memorandum and Order.

An appropriate Judgment of Remand will accompany this Order.

**IT IS HEREBY ORDERED** that the decision of the Commissioner be reversed and

remanded and that Claimant's complaint be dismissed with prejudice.


Dated this  31st   day of March, 2006.


    /s/ Terry I. Adelman
    UNITED STATES MAGISTRATE JUDGE